## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JENNIFER CARTER,           )
                                     )
                Plaintiff,     )
                                     )
             v.             )        1:13cv334
                                     )
CAROLYN W. COLVIN,      )
Acting Commissioner of Social   )
Security,                 )
                                     )
                Defendant.     )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Jennifer Carter, brought this action under the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) The Court has before it the certified administrative record (cited herein as "Tr. __"), as well as the parties' cross-motions for judgment (Docket Entries 10, 13; see also Docket Entry 11 (Plaintiff's Memorandum); Docket Entry 14 (Defendant's Memorandum); Docket Entry 15 (Plaintiff's Reply)). For the reasons that follow, the Court should enter judgment for Defendant.

## I.  PROCEDURAL HISTORY

Plaintiff filed an application for DIB. (Tr. 166-72.) Upon denial of that application initially (Tr. 84-100) and on reconsideration (Tr. 101-20), she requested a hearing de novo

before an Administrative Law Judge (the "ALJ") (Tr. 136-37). Plaintiff, her attorney, and a vocational expert (the "VE") attended the hearing. (See Tr. 32-65.) The ALJ subsequently ruled Plaintiff not disabled under the Act. (Tr. 10-31.) The Appeals Council denied her request for review (Tr. 1-6), making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1. [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2013.
>
> 2. [Plaintiff] has not engaged in substantial gainful activity since August 21, 2009, the alleged onset date.
>
> 3. [Plaintiff] has the following severe impairments: multiple sclerosis; diabetes mellitus; obesity; sleep apnea; degenerative joint disease of right knee; degenerative disc disease of lumbar spine, cervical spine, and thoracic spine; bilateral carpal tunnel syndrome; depression; anxiety; and obsessive-compulsive disorder.
>
> . . . .
>
> 4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.
>
> . . . .
>
> 5. . . . [Plaintiff] has the residual functional capacity to perform light work . . ., except that she requires a sit/stand option of 30 minutes and the ability to use a handheld assistive device for balancing. [Plaintiff] can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance and crouch; frequently stoop and kneel; never

2

crawl; and frequently, but not constantly, use the upper extremities for gross and fine manipulation. Additionally, [Plaintiff] should avoid concentrated exposure to extreme cold and extreme heat; should avoid concentrated exposure to hazards; due to the effects of multiple sclerosis and mental impairments, as well as the medication side effects, is limited to simple, routine, and repetitive tasks in a low-stress job, by this it is meant she can apply commonsense understanding to carry out oral, written and diagrammatic instructions; can get along with co-workers; and can have only occasional contact with the public.

. . . .

6.   [Plaintiff] is unable to perform any past relevant work.

. . . .

10.  Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform.

. . . .

11.  [Plaintiff] has not been under a disability, as defined in the . . . Act, from August 21, 2009, through the date of this decision.

(Tr. 15-25 (bold font and internal parenthetical citations omitted).)[1]

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely

---

[1]  In light of the differing terminology between the ALJ's decision and the parties' briefs and much of the medical evidence, this opinion uses the terms "multiple sclerosis" and "MS" interchangeably.

3

limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).
Plaintiff has not established entitlement to relief under this
extremely limited review standard.

## A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo."
Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead,
the Court "must uphold the factual findings of the ALJ if they are
supported by substantial evidence and were reached through
application of the correct legal standard." Hines, 453 F.3d at 561
(brackets and internal quotation marks omitted). "Substantial
evidence means 'such relevant evidence as a reasonable mind might
accept as adequate to support a conclusion.'" Hunter v. Sullivan,
993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402
U.S. 389, 401 (1971)). "It consists of more than a mere scintilla
of evidence but may be somewhat less than a preponderance." Mastro
v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal
quotation marks omitted). "If there is evidence to justify a
refusal to direct a verdict were the case before a jury, then there
is substantial evidence." Hunter, 993 F.2d at 34 (internal
quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not
undertake to re-weigh conflicting evidence, make credibility
determinations, or substitute its judgment for that of the [ALJ, as
adopted by the Commissioner]." Mastro, 270 F.3d at 176 (brackets

4

and internal quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age,

---

[2] The "Act comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (citations omitted).

education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process (the "SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and

---

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (citation omitted).

two, but falters at step three, *i.e.*, "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ([the] 'RFC')." <u>Id.</u> at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. <u>See</u> <u>id.</u> at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both . . . [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." <u>Hall</u>, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry her "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. <u>Hines</u>, 453 F.3d at 567.[5]

---

[4] The "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." <u>Hines</u>, 453 F.3d at 562 (noting that administrative regulations require the RFC to reflect the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (emphasis and internal quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." <u>Hall</u>, 658 F.2d at 265. The "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." <u>Hines</u>, 453 F.3d at 562-63.

[5] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of
(continued...)

## B. Assignments of Error

Plaintiff asserts that the ALJ erred (1) by formulating an RFC "inconsistent with the evidence" (Docket Entry 11 at 4) and (2) in evaluating certain medical opinions (id. at 6-7). Defendant contends otherwise and urges that substantial evidence supports the ALJ's findings. (See Docket Entry 14.)

### 1. The RFC

Plaintiff argues that the ALJ erred in fashioning the RFC in three regards. First, he allegedly "denied [Plaintiff's] claim for benefits relying on several misstatements of the record." (Docket Entry 11 at 4.)[6] Second, he purportedly "made several observations in his decision which demonstrate that he did not adequately review the record." (Id. at 5.) Third, according to Plaintiff, "[t]he ALJ's decision is also flawed because he did not consider the only functional capacity evaluation ([the] "FCE") in the record . . . ." (Id.) These contentions lack merit.

### i. Alleged Misstatement

To begin with, Plaintiff maintains that the ALJ misstated the record and "erred by finding that [Plaintiff] could sustain

---

[5] (...continued)
the SEP appear to gloss over the fact that an adverse finding against a claimant at step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

[6] Although maintaining that the ALJ relied on "several misstatements," Plaintiff identifies only one alleged misstatement. (See Docket Entry 11 at 4-6; see also Docket Entry 15 (identifying no additional alleged misstatements).)

8

substantial gainful activity based upon the number of her documented MS exacerbations." (Id. at 4-5.) In support of this contention, Plaintiff alleges that "[the ALJ] found that [Plaintiff] only had one severe flare up of MS in the past 2 years. (Tr[.] 19-22). Yet, the record reveals that she has experienced numerous flare ups of this condition." (Docket Entry 11 at 4.) Plaintiff further contends that the VE "present at the hearing testified that [Plaintiff] would be disabled if she experienced even one exacerbation per year." (Id.)

In actuality, the ALJ found that, at the hearing on August 18, 2011:

> [Plaintiff] said that her worst impairment was multiple sclerosis, and she had not had magnetic resonance imaging in about a year. [Plaintiff] reported that she had flare-ups about every three to six months, but her last severe flare-up was about two years ago. [Plaintiff] reported that her flare-ups were caused by stress and heat, and they lasted from three days to three weeks. She stated that her exacerbations caused balance problems, and she required the use of a cane.

(Tr. 19.) The ALJ's findings accurately summarize Plaintiff's testimony. (See Tr. 45-47.) In particular, she testified that, "[t]he last time that [her MS] flared up on [her, she] went numb on [her] right arm and [her] right leg, and [she] couldn't even pick up a pencil to write. [She] couldn't hardly walk. It was just really, really bad." (Tr. 45.) In response to the ALJ's questions regarding when this exacerbation occurred, Plaintiff testified,

"It's been a couple years."  (Id.)[7]  Plaintiff further testified that "[s]ome [exacerbations] are less severe than others."  (Tr. 46.)  As to their duration, Plaintiff testified:  "It depends.  It usually can last, usually around three days if it's a less severe one.  A real severe one will last — it can last anywhere from a week to three weeks."  (Id.)

Substantial evidence supports the ALJ's determination that Plaintiff's multiple sclerosis remained stable, with improvements and without severe exacerbations, during the relevant period (i.e., August 21, 2009, through November 3, 2011 (see Tr. 25)).  (See Tr. 21-22; see also Tr. 19.)  As to stability, Plaintiff's brain MRIs in September 2008, June 2009, August 2009, and August 2010 revealed no material changes in the number, appearance, and stability of Plaintiff's brain lesions.  (See Tr. 346, 351, 359, 697, 717, 988.) Moreover, Plaintiff's primary neurologist, Dr. Tellez, assessed Plaintiff's multiple sclerosis as stable on May 8, 2009, June 4, 2009, February 1, 2010, August 19, 2010, and March 11, 2011.  (See Tr. 351, 355, 797, 799, 986, 987-88.)

In regard to exacerbations, Plaintiff contends that, "[a]s Dr. Skeen noted in October of 2009, she was experiencing around 2 exacerbations per year."  (Docket Entry 11 at 4.)  Plaintiff overstates Dr. Skeen's observation.  According to Dr. Skeen's records,

---

[7]  Emergency department records reflect that this "[a]cute multiple sclerosis exacerbation" occurred around August 9, 2009.  (Tr. 702-03.)

> [Plaintiff] reports that she had 2 bad spells in the past year, the first one involving her right eye with significant improvement and resolution of her symptoms, and in her last episode she was completely numb on the right side. . . . [Plaintiff] reports that she currently also has a torn meniscus in her right knee and is pending a surgical correction.

(Tr. 643.) In examining Plaintiff, Dr. Skeen found that:

> [Plaintiff] is a well-developed, well-nourished female in no acute distress who is walking with a cane and a slight limp. Her examination today reveals some medial knee tenderness. . . . There is mild weakness in the proximal right leg and a giveway weakness below the knee. Her gait is mildly wide based and somewhat antalgic walking with a cane.

(Id.) Dr. Skeen "saw no significant enhancement" in her brain lesions in her August 2009 MRI compared to her previous MRI results. (Tr. 643-44.)

Further:

> [Dr. Skeen] described to [Plaintiff] that certainly 2 clinical exacerbations in 1 year is more than [they] like to see and would generally be cause for altering her medical management. [He] described to her that [they] did not have radiographic evidence of those relapses, but sometimes that occurs. . . . All in all, [Dr. Skeen] described to her that radiographically there does not appear to be much change, but clinically she certainly appears to have experienced 2 relapses in one year. [He] told [Plaintiff] it was reasonable, therefore, to consider altering her regimen, and [they] discussed the possibility of [various medicines. Plaintiff declined one medicine option as too potent and selected another medicine, which Dr. Skeen prescribed.] . . . [He] did not schedule her for follow-up . . . .

(Tr. 644.) Thus, Dr. Skeen determined that, based on Plaintiff's reported symptoms, Plaintiff appeared to have experienced two multiple sclerosis exacerbations in the year prior to October 2009,

not that Plaintiff had an ongoing pattern of experiencing two multiple sclerosis exacerbations each year. (Compare Tr. 643-44, with Docket Entry 11 at 4.)[8]

Plaintiff also maintains that she suffered exacerbations in August through October 2007, September 2008, May 2009, August 2009, February 2010, October 2010, and March 2011. (See Docket Entry 11 at 4.) As the alleged exacerbations in 2007, 2008, and May 2009 predate Plaintiff's onset date, they do not undermine the ALJ's conclusion that "[Plaintiff's] multiple sclerosis . . . [experienced] improvements and stability . . . after the alleged onset date" (Tr. 21). As discussed below, Plaintiff's remaining alleged exacerbations likewise fail to undermine the ALJ's determination that Plaintiff's multiple sclerosis remained generally stable, with improvements and without severe exacerbations, during the relevant period. (See Tr. 21-22; see also Tr. 19.)

On February 1, 2010, Dr. Tellez noted that "[Plaintiff] has not had any recent exacerbation of her multiple sclerosis." (Tr.

---

[8]   Notably, Dr. Skeen's report provides substantial evidence for the ALJ's conclusion that "the medical evidence showed continued improvement and stabilization [of Plaintiff's multiple sclerosis] after the alleged onset date." (Tr. 21.) For instance, although medical records reflect that Plaintiff experienced a slight weakness in her right arm immediately before and after her alleged onset date (see Tr. 345, 348), Dr. Skeen's report contains no mention of Plaintiff's right arm; instead, it only identifies weakness in Plaintiff's right leg, which possessed a torn meniscus (Tr. 643). Notwithstanding this weakness, Dr. Skeen concluded that Plaintiff was "in no acute distress" and could walk "with a cane and a slight limp" although "[h]er gait [wa]s mildly wide based." (Id.) Plaintiff's rejection of a medicine option as too potent and Dr. Skeen's decision not to schedule Plaintiff for a follow-up appointment (see Tr. 644) provide further evidence that Plaintiff's multiple sclerosis remained generally stable and had improved from her August 2009 exacerbation (see Tr. 702-03).

797.)  As Dr. Tellez explained on February 23, 2010, however, Plaintiff experienced a "pseudo exacerbation of her MS as she went to a hot tub on Thursday after being exercising [sic] in a gym where she was swimming.  She has been advised in the past to avoid heat, as this will worsen her demyelinating disorder in the way of the symptoms."  (Tr. 866.)  Nevertheless, at her appointment on February 23, 2010, Plaintiff was in "[n]o acute distress" and had "[n]ormal tone, bulk, and strength in [her] four extremities." (Tr. 865-66 (emphasis omitted).)  Moreover, "[i]n [that] examination, [Dr. Tellez] d[id] not see any difference from the one compared in the note documented dated [sic] February 1, 2010." (Tr. 866.)  Thereafter, in August 2010, Dr. Tellez noted that Plaintiff had experienced "no major relapses."  (Tr. 984.) Accordingly, substantial evidence supports the conclusion that this pseudo exacerbation did not qualify as severe.  See Hunter, 993 F.2d at 34.

At appointments with individuals other than her neurologist, Plaintiff reported exacerbations of her multiple sclerosis in October 2010 and March 2011.  (See Tr. 1022-24, 1056-59.) Substantial evidence supports the ALJ's determination that neither alleged exacerbation qualified as severe.  As to the first exacerbation, Plaintiff reported in a psychotherapy appointment on October 20, 2010, that "[o]ver the weekend her MS flared up and she had to go to the hospital.  [H]er daughter got married over t[he]

13

weekend up at the beach. [Plaintiff] said she cried all n[ig]ht."
(Tr. 1022.) At that appointment, however, the psychologist found
that "[Plaintiff] was awake, alert and oriented . . . .
[Plaintiff] ambulated independently but has MS. [Plaintiff]
reported reduced hearing and vision but it appeared functional
during evaluation. [Plaintiff's] speech was clear. Thought
processes were logical and goal-directed." (Tr. 1023.)

As to the latter exacerbation, at a March 2011 "routine follow
up on depression, MS, type 2 diabetes, and [hypertension],"
Plaintiff "[r]eport[ed] that her MS has been flaring some,
especially since her mom has had a stroke." (Tr. 1057.) At that
appointment, however, Plaintiff "ambulat[ed] normally," with
"normal gait and station," and was "healthy-appearing" and not in
acute distress. (Tr. 1058.) Furthermore, notwithstanding
Plaintiff's mother's September 2010 stroke (see Tr. 1022), Dr.
Tellez found in March 2011 that Plaintiff's multiple sclerosis
remained "[s]table" with "[n]o major relapses." (Tr. 987.) Dr.
Tellez's assessment of Plaintiff's multiple sclerosis as stable,
without serious exacerbations, comports with Plaintiff's subsequent
testimony that "[t]he last time that [her multiple scerosis] flared
up on [her]" was "a couple years" before the August 2011 DIB
hearing. (Tr. 45.) Accordingly, substantial evidence supports the
view that neither of these alleged exacerbations qualified as
severe. See Hunter, 993 F.2d at 34.

14

Severity matters for Plaintiff's remaining exacerbation contention: that the VE "present at the hearing testified that [Plaintiff] would be disabled if she experienced even one exacerbation per year." (Docket Entry 11 at 4 (citing Tr. 63).) At the DIB hearing, Plaintiff testified that her "less severe" multiple sclerosis exacerbations "last[] usually around three days," and only "[a] real severe one" lasts "from a week to three weeks." (Tr. 46.) Thereafter, Plaintiff's counsel asked the VE whether, "in addition to an assumption that this hypothetical individual might be absent two days a month, if she had periodic exacerbations of multiple sclerosis that would take her out of work for periods as long as one to three weeks" — "even once a year" — "would that person be employable." (Tr. 63.) The VE testified that such individual could not work on "a full-time and competitive basis." (Id.) Thus, at best, the VE's testimony suggests that if Plaintiff experienced one <u>severe</u> exacerbation each year, she could not maintain full-time, competitive employment. As discussed above, however, substantial evidence supports the ALJ's rejection of the position that Plaintiff experienced an annual severe multiple sclerosis exacerbation during the relevant period, rendering inapplicable this testimony, and futile Plaintiff's "misstatement" contention.

Moreover, substantial evidence supports the conclusion that Plaintiff's multiple sclerosis improved during the relevant period.

15

For instance, multiple medical records indicate that, after August 2009, Plaintiff regained normal strength in her right extremities. (Compare Tr. 345, 348 (finding, in August 2009, decreased strength in those extremities), with Tr. 798, 856, 859, 862, 866, 982, 985, 988, 991 (assessing, after August 2009, normal strength therein). Medical records similarly reflect that Plaintiff regained normal gait and station after August 2009. (Compare Tr. 346 (assessing Plaintiff's "Gait/Stance" as "somewhat ataxic" in August 2009), with Tr. 803, 830, 859, 862, 866, 879, 882, 890, 982, 985, 988, 991, 1041, 1045, 1058, 1062 (assessing, after August 2009, Plaintiff's gait and station as normal).) In addition, treatment records following a March 2011 car accident indicate that Plaintiff possessed a normal spinal range of motion and could walk on her heels and toes. (See Tr. 1155-59.) Finally, in the relevant period, Plaintiff possessed the capacity to drive (see Tr. 1155), to take vacations (see Tr. 1040), and to exercise (see Tr. 866).

In sum, substantial evidence supports the ALJ's determination that Plaintiff's multiple sclerosis remained stable, with improvements and without severe exacerbations, during the relevant period.

## ii. Alleged Inadequate Review

Plaintiff next contends that "[t]he ALJ made several observations in his decision which demonstrate that he did not adequately review the record." (Docket Entry 11 at 5.) Plaintiff

16

identifies only one such observation: "[the ALJ] found that [Plaintiff] was generally not fatigued with normal sensation and strength during examinations. (Tr[.] 20)." (Docket Entry 11 at 5.) Plaintiff maintains, however, "that she was usually fatigued with abnormal sensation even when not experiencing an exacerbation" and "was also noted for weakness at numerous visits." (Id.) As such, Plaintiff asserts, "it would seem that the ALJ was not basing this conclusion on the evidence of record." (Id.)

In making this contention, Plaintiff appears to take issue with the ALJ's findings regarding her sleep apnea, carpal tunnel syndrome, and diabetes mellitus. (See Tr. 20.) Specifically, in evaluating Plaintiff's sleep apnea, the ALJ found that, "[a]side from a treatment note in March 2011, which noted excessive daytime sleepiness due to noncompliance with medication, the remainder of the medical record documented that [Plaintiff] was generally active and alert without fatigue." (Id.) As to her carpal tunnel, the ALJ found that, "[a]fter the alleged onset date in August 2009, Sandhills Neurologists treatment records documented slightly reduced right upper extremity strength with normal tone and bulk. However, subsequent neurologic treatment records consistently documented normal tone, strength, and bulk in the upper extremities." (Id.) Finally, in regard to her diabetes mellitus, the ALJ found that "diabetic foot exams generally found normal

17

pedal pulses, no ulceration, and normal sensation." (Id.)
Substantial evidence supports each finding.

To begin with, substantial evidence supports the ALJ's finding
regarding Plaintiff's fatigue. Medical records reflect that
"[Plaintiff] struggles with sleep due to poor hygiene of sleep"
(Tr. 797), but that medicine helped Plaintiff's fatigue (see Tr.
344, 797, 984; see also Tr. 799 (recommending that Plaintiff "start
doing water aerobics and good sleep hygiene"); Tr. 982
("Recommended [Plaintiff] continue sleep hygiene."); Tr. 1011
(recommending that Plaintiff "[m]aintain proper sleep hygiene[]
. . . and regular consistent exercise")). On March 23, 2011,
however, "[Plaintiff] presented with excessive sleepiness [to Dr.
Chintalapudi]. . . . Current treatment includes provigil. By
report, there is poor compliance with treatment[.] Stopped taking
meds when she lost her insurance." (Tr. 990.)[9] Dr. Chintalapudi

---

[9] Plaintiff does not contend (1) that the ALJ erred in considering her failure
to comply with prescribed treatments when assessing her RFC or (2) that she was
financially unable to comply with these treatments. See generally Wyrick v.
Apfel, 29 F. Supp. 2d 693, 697–99 (M.D.N.C. 1998) (analyzing and rejecting
contention that the plaintiff "could not afford to receive treatment . . ., and
therefore, the ALJ could not use his failure to follow his physician's
recommendations as part of his decision rationale"). Here, the record does not
indicate when this alleged loss of insurance occurred. For example, medical
records from less than two weeks before this appointment reflect that Plaintiff
remained compliant in her Provigil usage. (See Tr. 987.) In addition, Plaintiff
obtained medical services in the intervening fortnight, and medical records from
those examinations do not reference any cessation of medicine or insurance. (See
Tr. 977-80.) Moreover, Plaintiff possesses a history of noncompliance with
prescribed medications unrelated to any insurance issues, calling into question
her apparent statement to Dr. Chintalapudi about the reason for her report of
noncompliance on March 23, 2011. (See, e.g., Tr. 353 ("There is fatigue and she
procrastinates to take the Provigil. She never increased it as recommended.").)
Regardless, medical records reflect that a week after this examination, on March
30, 2011, Plaintiff possessed insurance, including for prescriptions (see Tr.
1056), and remained on Provigil (see Tr. 1058-59; see also Tr. 1056 ("[Plaintiff]
(continued...)

18

recommended that Plaintiff "restart Provigil as she responded well in the past" and have "[a] return visit. . . in 1 year." (Tr. 991-92.) The ALJ could properly consider Plaintiff's noncompliance with her treatment plan in evaluating her fatigue allegations. See Wyrick v. Apfel, 29 F. Supp. 2d 693, 697-98 (M.D.N.C. 1998) (holding that the ALJ properly considered the detrimental effects of the plaintiff's noncompliance with prescribed treatments in assessing the plaintiff's RFC).

Moreover, at an examination only twelve days earlier, Plaintiff "denied . . . fatigue" and appeared "alert." (Tr. 987-88.) Medical records from that appointment describe Plaintiff's fatigue as "[s]table" and note that she continued "[t]aking Provigil without side effects and with compliance." (Tr. 987.) Other medical records likewise reflect that medicine ameliorated Plaintiff's fatigue. (See, e.g., Tr. 984.) In addition, although Plaintiff occasionally complained of fatigue (see Tr. 643, 693, 1060), medical records show that Plaintiff frequently reported no fatigue (see, e.g., Tr. 658, 878, 885, 984, 987). Furthermore, medical providers consistently described Plaintiff as "alert" (see, e.g., Tr. 345, 348, 693, 695, 798, 856, 985, 1000, 1004), even when she complained of fatigue (see, e.g., Tr. 693). Accordingly, substantial evidence supports the ALJ's conclusion that "the remainder of the medical record documented that [Plaintiff] was

_____

[9] (...continued)
is here today for her regular follow up and to go over medications.")).

19

generally active and alert without fatigue" (Tr. 20). See Hunter, 993 F.2d at 34.

So too with the ALJ's findings regarding Plaintiff's strength. Emergency department records on August 9, 2009, state that Plaintiff "[m]oves all extremities equally, has some diffuse weakness, but there is no focal weakness or lateralizing signs." (Tr. 703.) Dr. Tellez of Sandhills Neurologists found on August 17, 2009, that Plaintiff had "right hemiparesis 3+/5, left sided limbs normal tone, bulk, and strength." (Tr. 348 (emphasis omitted).) At Plaintiff's next appointment on August 31, 2009, following her alleged onset date, Dr. Tellez evaluated Plaintiff's "[r]ight upper extremity [as] 4+/5 with normal tone and bulk. Right lower extremity 4-/5 proximally and distally. Normal tone and bulk. Left sided limbs with normal power and tone." (Tr. 345 (emphasis omitted).) Notably, in assessing the effects of Plaintiff's multiple sclerosis at that visit, Dr. Tellez observed that, "[r]egarding her right lower extremity, it is a very hard call as she does have problems with her right knee. She has been told she has a torn ligament or meniscus." (Tr. 344.) On November 19, 2009, Plaintiff underwent corrective arthroscopic surgery on her torn meniscus (Tr. 673-74) that significantly improved her condition (see Tr. 797 ("[Plaintiff] underwent right knee surgery improving her gait and stability . . . ."); see also Tr. 943 ("[Plaintiff] is two weeks out from right knee arthoscopy . . . .

She states that it is a world of difference[,] the pain that she had has gone.")).

At subsequent medical appointments, Dr. Tellez and other doctors repeatedly found that Plaintiff possessed normal strength, tone, and bulk in all extremities. (See Tr. 798, 856, 859, 862, 866, 982, 985, 988, 991.) Medical records similarly reflect that Plaintiff suffered no muscle weakness during this period. (See Tr. 658, 878, 889, 893, 1040, 1061.) Accordingly, substantial evidence supports the ALJ's determination that, "[a]fter the alleged onset date in August 2009, Sandhills Neurologists treatment records documented slightly reduced right upper extremity strength with normal tone and bulk. However, subsequent neurologic treatment records consistently documented normal tone, strength, and bulk in the upper extremities" (Tr. 20). See Hunter, 993 F.2d at 34.

Substantial evidence also supports the ALJ's finding regarding sensation. (See Tr. 20.) Plaintiff's diabetic foot exams found "normal appearance," "normal" pedal pulses, "normal sensation," and, as to "[u]lceration[,] none noted." (Tr. 879; see also Tr. 1041 (same)). Furthermore, medical records reflect that Plaintiff repeatedly reported no abnormal sensation. (See Tr. 657, 877, 884, 888, 1039, 1056.) Additionally, particularly after Plaintiff's knee surgery, medical records describe Plaintiff's gait and station as normal. (See Tr. 803, 830, 859, 862, 866, 879, 882, 890, 982, 985, 988, 991, 1041, 1045, 1058, 1062.) As such, substantial

evidence supports the ALJ's finding that "diabetic foot exams generally found normal pedal pulses, no ulceration, and normal sensation" (Tr. 20). See Hunter, 993 F.2d at 34.

### iii.  The FCE

Finally, Plaintiff contends that

> [t]he ALJ's decision is also flawed because he did not consider the only functional capacity evaluation ("FCE") in the record which was performed on June 15, 2010 at Ergo Science.  Though the ALJ stated that he considered the opinion of Karin Wacker, the examiner, and gave it little weight, he never actually considered the objective medical evidence upon which that opinion was based.

(Docket Entry 11 at 5; see also Docket Entry 15 at 2.)

Plaintiff proffers no support for the proposition that the ALJ failed to consider the FCE.  To the contrary, the ALJ stated that he made "careful consideration of the entire record."  (Tr. 18 (emphasis omitted).)  Additionally, the FCE comprises the majority of Exhibit 35F in said record.  (See Tr. 1160-73.)  Under these circumstances, absent evidence indicating otherwise (which Plaintiff has not identified), the Court must accept that the ALJ considered the FCE in evaluating Plaintiff's RFC.  See Reid v. Commissioner of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) ("The Commissioner, through the ALJ and Appeals Council, stated that the whole record was considered, and, absent evidence to the contrary, we take her at her word.").

Moreover, the record demonstrates that the ALJ considered the FCE.  At the hearing, the ALJ inquired after the FCE, explaining

that Dr. Tellez's records, in page five of Exhibit 29F, reference an FCE, but that the ALJ "looked for it and [he] could not find it." (Tr. 56.) When Plaintiff's counsel "couldn't find it either" (id.), the ALJ asked Plaintiff about the FCE (see Tr. 56-57). The ALJ then asked Plaintiff's counsel to "try[] to get that [FCE]." (Tr. 57.) After the hearing, Plaintiff's counsel submitted the FCE to the ALJ as Exhibit 35F. (See Tr. 1172-73; see also Tr. 1172 ("Please add this report as a medical exhibit in [Plaintiff's] file, and with the addition of this report, we consent to the closing of the record.").) The ALJ then explicitly referenced this exhibit in analyzing Plaintiff's RFC. (See Tr. 20 (citing "[Ex.] 35F").)

In addition, the ALJ directly addressed the FCE in considering the opinion of Karin Wacker, who administered the FCE. (See Tr. 23.) Ms. Wacker's assessment and summation of the FCE results (Tr. 1161-65) constitute the first four pages of the "copy of [the] FCE" that Plaintiff's counsel submitted to the ALJ (Tr. 1172).[10] Thus, by discussing Ms. Wacker's opinion, the ALJ demonstrated that he in fact considered the late-submitted FCE. The ALJ further demonstrated his consideration of the FCE by including a "never crawling" limitation in the RFC (see Tr. 22), in accordance with

---

[10] This summation includes a detailed listing of Plaintiff's results on each task assessed in the FCE. (See Tr. 1163.) For instance, on the "One handed carrying" task, the "Client Performance" was "L5 lb Occ.[;]" on the "Balance on level surfaces" task, the "Client Performance" was "Adequate[;]" and on the "Crawling" task, the "Client Performance" was "Unable." (Id.)

23

the FCE's assessment that Plaintiff was "[u]nable" to "[c]rawl[]" (Tr. 1163, 1169), and contrary to the State agency medical consultants' assessment that Plaintiff could "[f]requently" "[c]rawl[]" (Tr. 94, 112). Hence, the record rebuts Plaintiff's contention that the ALJ did not consider the FCE. See Reid, 769 F.3d at 865 ("conclud[ing] that the Commissioner's decision satisfied the statutory requirements" and noting that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" (internal quotation marks omitted)).

In sum, Plaintiff's challenges to the ALJ's evaluation of her RFC lack merit. Furthermore, based on their review of Plaintiff's medical records, two State agency medical consultants determined that Plaintiff could perform modified light work. (See Tr. 93-98, 111-18.) These assessments provide additional support for the RFC and the ALJ's determination that Plaintiff does not qualify as disabled. Accordingly, the Court should deny Plaintiff's first assignment of error.

## 2. Medical Opinions

Plaintiff next contends that the ALJ erred in his consideration of the medical opinions of Ms. Wacker and Dr. Tellez. (See Docket Entry 11 at 6-7.) Specifically, Plaintiff maintains that the "ALJ erred in his assessment of Ms. Wacker's evaluation" because "[h]e claimed to give her opinion on the results of the FCE little weight reasoning that the record supported his RFC for a

24

reduced range of light work and because she was not an acceptable medical source." (Id. at 7.)  Plaintiff further argues that "[t]he ALJ [reversibly] erred by not even mentioning, much less considering and weighing, the opinion of Dr. Tellez, [Plaintiff's] treating neurologist, that she was disabled from working due to her MS symptoms including gait disturbance, poor balance, decreased sensation and weakness."  (Id. at 6.)  In response, Defendant disputes Plaintiff's contentions regarding Ms. Wacker's opinion and urges that the ALJ committed harmless error in failing to discuss Dr. Tellez's opinion.  (Docket Entry 14 at 8-11.)[11]  Plaintiff's contentions lack merit.

### i.  **Applicable Standards**

Under the so-called treating physician rule, an ALJ generally must afford controlling weight to the opinion of a treating source as to the nature and severity of a claimant's impairment, on the ground that treating sources "provide a detailed, longitudinal

---

[11]  "The federal 'harmless-error' statute, now codified at 28 U.S.C. § 2111, tells courts to review cases for errors of law 'without regard to errors' that do not affect the parties' 'substantial rights.'" Shinseki v. Sanders, 556 U.S. 396, 407 (2009).  Moreover, the United States Supreme "Court has said that the party that seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted." Id. at 409 (internal quotation marks omitted).  "[C]ourts have correlated review of ordinary administrative proceedings to appellate review of civil cases in this respect. Consequently, the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." Id. (citing with approval, inter alia, Nelson v. Apfel, 131 F.3d 1228, 1236 (7th Cir. 1997), a Social Security disability case).  Consistent with Sanders, the Fourth Circuit repeatedly has recognized the applicability of the harmless error doctrine in the Social Security disability context. See Mascio v. Colvin, 780 F.3d 632, 636-37, 639 (4th Cir. 2015); Garner v. Astrue, 436 F. App'x 224, 226 n.* (4th Cir. 2011); Morgan v. Barnhart, 142 F. App'x 716, 723 (4th Cir. 2005); Camp v. Massanari, 22 F. App'x 311, 311 (4th Cir. 2001).

picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2).[12] The rule also recognizes, however, that not all treating sources or treating source opinions deserve such deference. See Johnson v. Barnhart, 434 F.3d 650, 654 n.5 (4th Cir. 2005) ("The ALJ is not required in all cases to give the treating physician's opinion greater weight than other evidence . . . .").

To begin with, the nature and extent of each treatment relationship may temper the weight afforded. 20 C.F.R. § 404.1527(d)(2)(ii). Further, a treating source's opinion controls only if well-supported by "medical signs and laboratory findings" and consistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2)-(4). "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590; accord Mastro, 270 F.3d at 178. Finally, opinions regarding issues reserved to the Commissioner, regardless of source, do not receive controlling

---

[12] Effective March 26, 2012, a re-codification moved the treating physician rule to 20 C.F.R. § 404.1527(c)(2), but without substantive change. See 77 Fed. Reg. 10651-10657 (Feb. 23, 2012). Given that all material events in this action preceded this non-substantive amendment, the undersigned will use the pre-March 26, 2012 citations.

26

weight. See 20 C.F.R. § 404.1527(e); see also Morgan v. Barnhart, 142 F. App'x 716, 722 (4th Cir. 2005) ("While the ALJ must give a treating physician's *medical opinions* special weight in certain circumstances, the ALJ is under no obligation to give a treating physician's *legal conclusions* any heightened evidentiary value." (emphasis in original; citation omitted)).

Moreover, physical therapists do not qualify as "acceptable medical sources" under the regulations. See 20 C.F.R. § 404.1513(a); see also 20 C.F.R. § 404.1513(d)(1) (defining "[o]ther sources" as, inter alia, "[m]edical sources not listed in paragraph (a) of this section"). Accordingly, although the ALJ must consider a physical therapist's medical opinion in assessing a claimant's impairments and RFC, that medical opinion, as a general proposition, does not warrant controlling weight. Turberville v. Colvin, No. 1:11CV262, 2014 WL 1671582, at *6 (M.D.N.C. Apr. 23, 2014), recommendation adopted, slip op. (M.D.N.C. May 15, 2014); see also Corson v. Astrue, 601 F. Supp. 2d 515, 531-32 (W.D.N.Y. 2009) (observing that "physical therapists' opinions are not medical opinions" under the regulations and that physical therapists' opinions do not "require recognition and weight by the Commissioner equal to a medical doctor").

Nevertheless, the ALJ must still evaluate the medical opinions of "other sources" and sufficiently indicate and explain the weight that the ALJ affords such opinions. See 20 C.F.R. § 404.1527(d);

Social Security Ruling 96-5p, <u>Medical Source Opinions on Issues</u> <u>Reserved to the Commissioner</u>, 1996 WL 374183, at *5 (July 2, 1996) (the "SSR 96-5p") (noting that ALJs "must weigh medical source statements . . . [and] provid[e] appropriate explanations for accepting or rejecting such opinions"). Similarly, the ALJ cannot "simply . . . ignore a treating physician's legal conclusions, but must instead 'evaluate all the evidence in the case record to determine the extent to which the [treating physician's legal conclusion] is supported by the record.'" <u>Morgan</u>, 142 F. App'x at 722 (alteration in original) (quoting SSR 96-5p, 1996 WL 374183, at *3). However, "[a]s a general rule, [courts] have held that an ALJ's failure to adequately explain his factual findings is not a sufficient reason for setting aside an administrative finding where the record supports the overall determination." <u>Scott ex rel.</u> <u>Scott v. Astrue</u>, 529 F.3d 818, 822 (8th Cir. 2008) (internal quotation marks omitted); <u>see also</u> <u>Ngarurih v. Ashcroft</u>, 371 F.3d 182, 190 n.8 (4th Cir. 2004) ("While the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained, reversal is not required where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached." (citation and internal quotation marks omitted)); <u>Stewart v. Apfel</u>, No. 98-1785, 182 F.3d 909 (table), 1999 WL 485862, at *5 (4th Cir. July 12, 1999) (concluding that,

28

although "the ALJ's report completely fail[ed] to mention the evaluation by [a medical source]" and "the ALJ . . . was not as thorough as he could have been," the district court properly concluded that substantial evidence supported the ALJ's decision and the ALJ adequately "explained why he came to the conclusion that he did"); Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a [Social Security] case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

### ii.  Ms. Wacker's Opinion

As an initial matter, contrary to Plaintiff's contentions, the ALJ did not discount Ms. Wacker's opinion by "reasoning that the record supported his RFC for a reduced range of light work" (Docket Entry 11 at 7).  Instead the ALJ discounted Ms. Wacker's opinion that "[Plaintiff] could not sustain a sedentary exertion for an eight-hour day or 40-hour workweek" because "[t]he longitudinal clinical and diagnostic evidence of record, discussed above, did not support this opinion."  (Tr. 23.)  Substantial evidence supports this finding.  For instance, Ms. Wacker based her opinion that Plaintiff lacked the capacity for sedentary work on Ms. Wacker's assessment that Plaintiff's "[d]ynamic strength portion scored at 5 pounds," generating a "5 pound limit." (Tr. 1161.)  In reaching this conclusion, Ms. Wacker found that, on a "[b]rief

29

musculoskeletal screen," Plaintiff's "gross motor strength is in the 3+/5 range." (Tr. 1162.) This finding contradicts Dr. Tellez's assessment of Plaintiff's strength, which he evaluated at a low point, immediately following her alleged onset date, of "4+/5" in her "[r]ight upper extremity" and "4-/5" in her "[r]ight lower extremity" "with normal power and tone" in her "[l]eft sided limbs" (Tr. 345 (emphasis omitted)), but otherwise deemed normal throughout the relevant period (even following Plaintiff's pseudo exacerbation in February 2010) (see Tr. 798, 856, 866, 985, 988).[13]

Moreover, multiple medical records indicate that Plaintiff suffered no muscle weakness in the relevant period. (See Tr. 658, 878, 889, 893, 1040, 1061.) In addition, Ms. Wacker opined that Plaintiff could not sustain a sedentary level of work because "[Plaintiff] became easily fatigued with dizziness interfering with completion of task often." (Tr. 1161.) Yet, medical records reveal that during the relevant period, Plaintiff repeatedly denied fatigue (see Tr. 658, 874, 878, 881, 885, 889, 893, 1040, 1044, 1048, 1052), dizziness (see Tr. 657-58, 678, 877-78, 881, 884, 888-89, 892, 1056-57), and exercise intolerance (see Tr. 658, 881, 885, 889, 893). Accordingly, substantial evidence supports the ALJ's

---

[13] Given their proximity to Plaintiff's FCE on June 15, 2010, Dr. Tellez's May 20, 2010 and August 19, 2010 examinations of Plaintiff are particularly noteworthy: in both examinations, Dr. Tellez found that Plaintiff had "normal tone, strength and bulk in all extremities and strength: extremities 5/5." (Tr. 856, 985.) Similarly, on May 7, 2010, and July 2, 2010, Dr. Chintalapudi at Sandhills Neurologists found that Plaintiff had "normal tone, strength and bulk in all extremities and strength: extremities 5/5." (Tr. 859, 982.)

finding that Ms. Wacker's opinion contradicted "[t]he longitudinal clinical and diagnostic evidence of record." (Tr. 23.)

Nevertheless, Plaintiff contends that the ALJ reversibly erred in discounting Ms. Wacker's opinion because she was a physical therapist. (Docket Entry 11 at 7.) In evaluating Ms. Wacker's opinion, the ALJ noted that "a physical therapist is not an acceptable medical source" and stated that "[o]nly acceptable medical sources can give medical opinions." (Tr. 23.) The ALJ's failure to explicitly address each of the factors of 20 C.F.R. § 404.1527(d) constitutes harmless error.

In rendering his decision, the ALJ stated that he "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (Tr. 19.) Thus, in assigning "little weight" to Ms. Wacker's opinion (Tr. 23), the ALJ implicitly considered the 20 C.F.R. § 404.1527(d) factors (i.e., examining relationship, treatment relationship, including "[l]ength of the treatment relationship and the frequency of examination," supportability, consistency, specialization, and any "[o]ther factors . . . which tend to support or contradict the opinion," id.). See Reid, 769 F.3d at 865 ("[O]ur general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter" (alteration in original) (quoting Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005))). Ms. Wacker administered an

FCE to Plaintiff on June 15, 2010, and based her opinion regarding Plaintiff's capacities entirely on Plaintiff's results from that FCE. (See Tr. 1161-71.) The ALJ's failure to more thoroughly address the factors supporting his discounting of Ms. Wacker's opinion regarding this one-time endeavor does not constitute reversible error in light of the substantial evidence supporting both (1) his conclusion that "[t]he longitudinal clinical and diagnostic evidence of record, discussed above, did not support [her] opinion" (Tr. 23), and (2) his decision to deny benefits. See Fitzgerald v. Colvin, No. 2:12cv78, 2013 WL 6178563, at *5 (E.D.N.C. Nov. 25, 2013) ("To the extent [the plaintiff] alleges that the ALJ should have more thoroughly explained the weight given to [certain medical source] opinions, a district court must affirm the decision of an ALJ who 'was not as thorough as he could have been' if it finds, after reviewing the record as a whole, that substantial evidence supports the decision." (quoting Stewart, 1999 WL 485862, at *5)).

### iii. Dr. Tellez's Opinion

Finally, Plaintiff contends that the ALJ committed reversible error by failing to consider Dr. Tellez's August 31, 2009 opinion that Plaintiff qualified as disabled. (See Docket Entry 11 at 6-7; see also Docket Entry 15 at 1-2.) According to Plaintiff, the ALJ failed to consider "the opinion of Dr. Tellez[] . . . that [Plaintiff] was disabled from working due to her MS symptoms

32

including gait disturbance, poor balance, decreased sensation and weakness." (Docket Entry 11 at 6 (citing Tr. 344-46).) In response, Defendant maintains that, at most, the ALJ committed harmless error by not discussing Dr. Tellez's statement that "I did advise [Plaintiff] not to work at this point as she is quite disabled" (Tr. 346). (See Docket Entry 14 at 8-9.)[14] Plaintiff's contention lacks merit.

As a preliminary matter, Plaintiff errs in contending that the ALJ failed to consider Dr. Tellez's August 31, 2009 opinion. As noted previously, the ALJ stated that he considered "the entire record" in rendering his decision. (Tr. 18 (emphasis omitted).) Dr. Tellez's August 31, 2009 medical report constitutes the first three pages of Exhibit 3F. (See Tr. 344-46.) Accordingly, absent evidence indicating otherwise (which, again, Plaintiff has not

---

[14] In so contending, Defendant asserts that the ALJ's evaluation of a similar statement by Plaintiff's treating psychiatrist, Dr. Mandell (see Tr. 23), rendered harmless his failure to address Dr. Tellez's statement. (See Docket Entry 14 at 8-9 (relying on Zabala v. Astrue, 595 F.3d 402 (2d Cir. 2010)).) Although ambiguous, Dr. Mandell's assessment arguably (and logically) related to Plaintiff's mental health. (See Tr. 736 (documenting that, in response to Plaintiff's depression, "[Dr. Mandell] recommended a medical leave of absence from work for the next few days"); see also Tr. 23 (concluding that "the objective evidence, including Dr. Mandell's own treatment records[,] showed stabilization and some improvement in [Plaintiff's] symptoms and level of functioning after this opinion was offered").) As one doctor's assessment that a claimant qualifies as disabled mentally does not equate to another doctor's assessment that a claimant qualifies as disabled physically, the ALJ's consideration of Dr. Mandell's opinion does not render harmless his failure to address Dr. Tellez's opinion. See generally Greek v. Colvin, 802 F.3d 370, 376 (2d Cir. 2015) ("The district court's reliance on Zabala was misplaced. In Zabala, the ALJ failed to consider a second, virtually identical opinion by the same treating physician. Here, by contrast, the only other evidence that the ALJ might have considered and rejected was testimony from non-treating physicians and lay witnesses about the nature of [the plaintiff's] condition. Consideration of such lay testimony is not a substitute for proper consideration of a treating physician's medical opinion.").

33

identified), the Court must accept that the ALJ considered Dr. Tellez's opinion in evaluating Plaintiff's RFC. See Reid, 769 F.3d at 865. Moreover, the record supports that the ALJ considered this opinion. For example, the ALJ cited Exhibit 3F multiple times in his decision (see Tr. 20-22), and explicitly relied on findings from Dr. Tellez's August 31, 2009 report in evaluating Plaintiff's upper extremity strength, tone, and bulk (see Tr. 20; see also Tr. 345). In addition, at the hearing, Plaintiff's counsel and Plaintiff discussed Dr. Tellez's opinion:

> [Counsel:] "Has Dr. Tellez indicated to you anything about his opinion about your ability to work?
> [Plaintiff:] He's told me that he didn't see how I could with as much as I was out of work.

(Tr. 48-49.) Accordingly, Plaintiff has not shown that the ALJ failed to consider Dr. Tellez's August 31, 2009 opinion.

Plaintiff correctly maintains that the ALJ failed to discuss Dr. Tellez's August 2009 opinion that Plaintiff "is quite disabled" (Tr. 346). However, Plaintiff overstates the scope of this opinion. (See Docket Entry 11 at 6 (asserting that Dr. Tellez opined "that [Plaintiff] was disabled from working due to her MS symptoms including gait disturbance, poor balance, decreased sensation and weakness").) The seventh entry on a list of recommendations in Dr. Tellez's August 31, 2009 medical report states in its entirety: "7. I did advise the patient not to work at this point as she is quite disabled." (Tr. 346.) Thus, contrary to Plaintiff's contention, Dr. Tellez did not specifically

34

connect his assessment that Plaintiff "is quite disabled" to any particular multiple sclerosis symptoms. Nor did Plaintiff connect Dr. Tellez's opinion to any specific multiple sclerosis symptoms at the hearing when she testified that Dr. Tellez "told [her] that he didn't see how [she] could [work] with as much as [she] was out of work." (Tr. 49.) Furthermore, at that hearing, the ALJ asked Plaintiff's "[c]ounsel, are there any specific restrictions or limitations that are put on [Plaintiff] by any of the treating physicians?" (Tr. 63.) Plaintiff's counsel stated that no such restrictions existed. (See id. ("Not that I saw, Your Honor.").) Under these circumstances, Dr. Tellez's opinion that Plaintiff "is quite disabled" does not qualify as a "medical opinion" generally entitled to deference. See 20 C.F.R. § 404.1527(a)(2) (defining "medical opinions" as "statements . . . that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical and mental restrictions").

Instead, Dr. Tellez's statement constitutes a legal opinion to which the ALJ owed no deference. See 20 C.F.R. §§ 404.1527(e)(1) & (e)(3). This statement occurred in August 2009, ten days after Plaintiff's alleged onset date. (See Tr. 13, 346.) The ALJ considered the medical evidence from that report in analyzing Plaintiff's impairments. (See Tr. 20 ("After the alleged onset

35

date in August 2009, Sandhills Neurologists treatment records documented slightly reduced right upper extremity strength with normal tone and bulk."); Tr. 345 (documenting reduced strength); see also Tr. 21 ("No significant changes were seen on MRIs in September 2008, June 2009, and August 2009"); Tr. 346 (documenting that "[b]rain and cervical MRI . . . dated August 19, 2009 did not show any significant changes as compared with previous images").) As previously discussed, substantial evidence, including Dr. Tellez's own medical assessments, supports the conclusion that Plaintiff's multiple sclerosis improved and stabilized after August 2009. As such, Plaintiff has not shown prejudicial error from the ALJ's failure to discuss Dr. Tellez's August 2009 statement that "at this point . . . [Plaintiff] is quite disabled" (Tr. 346).

In sum, the ALJ did not reversibly err in evaluating Ms. Wacker's opinion or in omitting a discussion of Dr. Tellez's August 2009 opinion. Accordingly, the Court should deny Plaintiff's second assignment of error.

### III. CONCLUSION

Plaintiff has established no grounds for relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 10) be denied, that

Defendant's Motion for Judgment on the Pleadings (Docket Entry 13) be granted, and that judgment be entered for Defendant.

This 2nd day of May, 2016.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**
